UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CHEVRON MIDSTREAM | CIVIL ACTION |
| PIPELINES LLC, ET AL. | |
| | |
| VERSUS | NUMBER:  13-2809 |
| | c/w 13-3197 |
| | |
| SETTOON TOWING LLC, ET AL. | SECTION:  "A"(5) |

## ORDER AND REASONS

Before the Court is the Motion to Compel Production of Root Cause Analysis filed by Defendant/Petitioner in Limitation, Settoon Towing LLC ("Settoon") (Rec. doc. 253).  The Motion is opposed by Plaintiffs/Claimants in Limitation, Chevron Midstream Pipelines, LLC; Chevron Pipe Line Company; and Chevron U.S.A. ("Chevron") (Rec. doc. 258).  Settoon also filed a Reply Memorandum.  (Rec. doc. 267).

The Court heard oral argument on the motion November 12, 2014.  (Rec. doc. 270). Following that hearing, the Court ordered Chevron to produce for *in camera* inspection certain documents subject of the Motion that were identified on Settoon's privilege log,[1] following which the Court would reconvene the November 12 hearing.  (*Id.*).  The Court has conducted a thorough analysis of the documents submitted for *in camera* review.  Having considered the parties pleadings and supporting proof, the documents at issue, the relevant legal authority and the parties' oral arguments, the Court finds that additional oral argument is unnecessary and rules as follows:

---

[1] Following the hearing, counsel for Chevron submitted the 144 "challenged" documents, along with a revised privilege log listing those documents, for *in camera* review.  The Court had both Chevron's letter and the attached privilege log filed into the record, where they are identified as record documents 306 and 307.

## I.      BACKGROUND

This consolidated litigation arises from a March 12, 2013 incident in which the M/V SHANON SETTOON, a vessel owned and operated by Settoon, allided with Chevron's VP-01 pipeline in Bayou Perot, Louisiana, resulting in a release of product that caused an explosion and fire  (Rec. doc. 1, 13-CV-2809).  That explosion and fire allegedly caused a number of personal injuries, including the death of a crewmember, and extensive property damage. (*Id.*).

Chevron filed a Complaint against Settoon for property damage to the pipeline (*id.*), which was followed in turn by Settoon's filing of a Limitation of Liability action seeking exoneration and/or limitation of liability for the allision.   (Rec. doc. 1, 13-CV-3197). Numerous other parties, including personal injury claimants, have joined this litigation in various capacities.  The two matters were consolidated by the District Judge and discovery, written and otherwise, has proceeded accordingly.   Both Chevron and Settoon acknowledge in their respective pleadings related to this Motion that the parties agreed prior to initiation of written discovery that they would make every effort not to engage in unnecessarily duplicative discovery.  As such, the present Motion focuses on Chevron's response to a particular Request for Production propounded, not by Settoon, but by claimant, Vernon Whittington.  Owing to their pre-discovery agreement, both parties concur that the adequacy of Chevron's response to Whittington's request is properly before this Court via Settoon's Motion.

## II.     THE PARTIES' CONTENTIONS

The present Motion seeks production of a "Root Cause Analysis" ("RCA") and related documents created by Chevron in the days and weeks following the subject incident.

Resisting production of these materials, Chevron claims the RCA was "legally chartered," and therefore it and the documents related to it are protected by the attorney-client and work-product privileges. (*See generally* Rec. doc. 258).

In support of its position, Chevron explains that, "in the immediate aftermath of the incident, the likelihood of litigation was apparent" to its in-house counsel, Joel Youngblood ("Youngblood"). (Rec. doc. 258 at 2; Declaration of Joel Youngblood, Rec. doc. 258-1). According to Youngblood, he thereafter appointed an "RCA Team," consisting of six Chevron employees and two in-house lawyers, including himself, to "investigate and gather information necessary to provide legal advice to Chevron concerning the Incident, including [his] evaluation of Chevron's legal rights, claims, and defenses related to anticipated litigation and administrative proceedings." (Rec. doc. 258-1 at 2).

To effectuate the appointment of this "RCA Team" and to maintain the confidentiality of its work and work product, Youngblood prepared and signed a "Root Cause Investigation Legal Charter," a copy of which Chevron attached to its Opposition Memorandum. (Rec. doc. 258-1 at 5-6). That "Legal Charter" instructed the members of the RCA Team to treat and mark all documents associated with their work as "highly confidential." (*Id.*). Youngblood declares that, upon receipt of the RCA Team's work product and source materials, he kept those materials "in strictest confidence as attorney-client information within [Chevron's] Law Department." (Rec. doc. 258-1 at 3).

On the basis of the Legal Charter and Youngblood's Declaration describing its genesis and his handling of the RCA Team's work product upon the completion of its work, Chevron seeks to protect the RCA and all documentation related to its creation under both

the attorney-client and work product privileges.   Importantly, Chevron, through

Youngblood, claims the following:

> Within Chevron, legally chartered root cause investigations are
> not routine.   While root cause procedures are utilized by
> Chevron's Health, Environmental, and Safety (HES) group to
> analyze incidents and near miss events, often in conjunction
> with outside contractors, in order to identify improvements to
> procedures or equipment, HES incident reviews are separate
> and distinct from root cause analyses conducted at the request
> of the Law Department pursuant to a Legal Charter.

(Rec. doc. 258-1 at 4).

Chevron relies heavily on *Bross v. Chevron U.S.A., Incorporated*,[2] a case involving a

similarly "legally chartered" RCA, for the proposition that courts have found that the

attorney-client and work-product privileges both apply to such legally chartered root cause

investigations.

Settoon takes issue with Chevron's claims of privilege over these documents.

Settoon focuses its arguments on Chevron's claims of work-product protection, as the vast

majority of the disputed documents are withheld solely on the basis of this claimed

privilege.[3]   Generally, citing Fifth Circuit precedent, Settoon insists that the "primary

motivating factor" behind the creation of the RCA and its related documents was "to

increase safety and prevent recurrence of incidents," as opposed to the anticipation of

litigation, as claimed by Chevron and Youngblood.   (Rec. doc. 253-1 at 11 (citing *United*

*States v. Davis*, 636 F.2d 1028, 1039 (5th Cir. 1981)).   Settoon points to testimony and

statements of key Chevron employees that it says establish that root cause analyses are

---

[2]  No. 06-CV-1523, 2009 WL 854446 at *4 (W.D. La. Mar. 25, 2009).
[3] Of 144 documents listed on Chevron's privilege log, only 28 are subject to a claim of attorney-client privilege
(and all of those are also subject to work-product claims).  (Rec. doc. 307).

matters of routine at Chevron following accidents and near-miss incidents and, as such, cannot fall under the protection of the work-product privilege.

As to Chevron's claims of attorney-client privilege, Settoon complains that most, if not all, of the documents subject to this claimed privilege were not sent, received or created by a lawyer; that the information therein was not intended to be kept nor was it actually kept confidential as required by law; and that the subject communications were not made for the purpose of obtaining or providing legal advice because they relate to an undertaking (the root cause investigation) that is routine and is conducted as a matter of course after an accident.  (*See generally* Rec. doc. 267 at 3-4).

### III.    LEGAL ANALYSIS

The federal common law of privilege governs these maritime-law claims.  Fed. R. Evid. 501.  The burden of demonstrating the applicability of both the attorney-client privilege and the work-product privilege rests on the party who invokes them.  *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985).  Here, it is Chevron's burden to demonstrate that either the attorney-client privilege or work-product immunity is applicable to the various documents it seeks to protect from disclosure.

### A.    The Attorney-Client Privilege

The attorney-client privilege protects from disclosure confidential communications made to obtain a lawyer's professional advice and assistance.  *Bross*, 2009 WL 854446 at *4; *S.E.C. v. Brady*, 238 F.R.D. 429, 438 (N.D. Tex. 2006).  The purpose of the attorney-client privilege is well-established:  to encourage candid communications between client and counsel.  *Upjohn Co. v. United States*, 449 U.S. 383, 390-91, 101 S.Ct. 677, 683 (1981).

Applicability of the privilege "is a question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents." *Hodges*, 768 F.2d at 721.

A party invoking the attorney-client privilege must establish: (1) that there was a communication between client and counsel; (2) the communication was intended to be confidential; (3) the communication was, in fact, kept confidential; and (4) the communication was made for the purpose of obtaining or providing legal advice. *U.S. v. Construction Products Research, Inc.*, 73 F.3d 464, 473–74 (2nd Cir.), *cert. denied*, 519 U.S. 927, 117 S.Ct. 294 (1996).

Questions often arise as to whether the scope of the privilege should differ as between private and corporate clients. While the Supreme Court in *Upjohn* recognized the risk that an expansive application of the attorney-client privilege to corporations could impose severe burdens on discovery and create a broad "zone of silence" over corporate affairs, that same Court concluded that effective representation by counsel "depends upon the lawyer's being fully informed by the client ." *Upjohn*, 449 U.S. at 389, 101 S.Ct. at 682; *see also Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona*, 881 F.2d 1486, 1492 (9th Cir. 1989). The Fifth Circuit has explained in this context that "what is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer." *U.S. v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982)(internal quotations and citation omitted).

The Fifth Circuit in *El Paso* noted the holding of *Upjohn*, that "[b]ecause the purpose of the attorney-client privilege is to promote the flow of information to the attorney to enable him to give informed legal advice, communications from lower echelon employees were within the privilege as long as the communications were made to the attorney to

assist him in giving legal advice to the client corporation." *Id.* at 538 n. 8 (discussing *Upjohn*, 449 U.S. 388-96, 101 S.Ct. at 682–86).

Notable in the present matter, "[t]he attorney-client privilege protects two related, but different, communications: (1) confidential communications made by a client to his lawyer for the purpose of obtaining legal advice; and (2) any communication from an attorney to his client when made in the course of giving legal advice, whether or not that advice is based on privileged communications from the client." *Brady*, 238 F.R.D. at 438-39 (citing *U.S. v. Mobil Corp.*, 149 F.R.D. 533, 536 (N.D. Tex. 1993)).

Turning to the merits of Chevron's claim and the question of whether it has met its burden as to any of the documents withheld as attorney-client communications, the Court first notes, as referenced earlier, that relatively few of the documents withheld by Chevron are said to be protected by this privilege; in fact Chevron devotes very little in the way of argument or factual support to bolster its claim that the 28 documents listed as attorney-client communications are, in fact, protected.  The two pages of brief devoted to this argument consist of the restatement of portions of Youngblood's declaration and selective quotations from the *Bross*  and *Upjohn* decisions, summed up by the conclusory observation that all of the "report and materials generated by Chevron's RCA Team for the benefit of Chevron's in-house counsel constitute privileged, non-discoverable communications between client and counsel for the purpose of obtaining legal advice." (Rec. doc. 258 at 4-6).

While Chevron seems to posit in the above-quoted statement that *all* of the withheld documents are subject to that privilege, it specifically invoked that privilege as to only a fraction of them.  A litigant "may not withdraw behind the shield of the attorney-client

privilege" unless it "particularize[s] its assertion of the privilege and prove[s] its case with respect to [each] specific document." *El Paso*, 682 F.2d at 541. Blanket assertions of privilege "disable the court and the adversary party from testing the merits of the claim of privilege" and are therefore not sufficient to meet the relevant burden proof. *Id.* Accordingly, with the limited exception discussed below, the Court considers only those specific documents as to which the attorney-client privilege was claimed.

The documents listed in the Chevron privilege log as attorney-client communications are numbers 4, 15, 16, 19-25, 27, 28, 31, 40-47, 49, 57, 79, 94, 97, 140, and 141. The Court has reviewed each of these documents *in camera* and finds that documents **15, 19-25, 27, 28, and 57** were transmitted to or from counsel for the purpose of rendering or obtaining legal advice and that Chevron has satisfied its burden of proving they are subject to the attorney-client privilege. These documents are protected and shall not be produced.

The Court further finds that documents **4, 16, 140, and 141** contain both privileged and non-privileged information and that these documents shall be produced with the privileged information redacted as per the Court's instructions below. In addition and for the same reasons, the Court will order redactions made to the following documents, over which claims of attorney-client privilege were not expressly made on the privilege log: documents **1, 5, 18, 26, 34, 63, 75, 80, and 83**. While the privilege was not properly claimed on these documents in the privilege log, *El Paso*, 682 F.2d at 541, the Court finds that this omission should be excused, as a review of the documents reveals they are largely identical to documents over which the privilege *was* properly invoked. The Court therefore finds it appropriate to "relax" the rule enunciated in *El Paso* in this instance and allow for

redaction of those documents. *United States v. Davis*, 636 F.2d 1028, 1044 n. 20 (5th Cir. 1981).[4]

As to the remaining documents over which the attorney-client privilege has been claimed, Chevron has failed to carry its burden of proving they are subject to the privilege. The bare assertions of Chevron and its in-house counsel, in brief and on the privilege log itself, when viewed against the actual content of the documents themselves, are simply insufficient to establish that these documents are attorney-client communications entitled to protection.

The subject documents are not privileged on their face and there is insufficient information provided by Chevron as to each document for the Court to determine whether they are, in fact, privileged. Many of these documents indicate that they were sent to non-lawyers in the company and, while Youngblood stated in his declaration that *he* kept information related to the RCA investigation in the "strictest" of confidence, he did not (and likely cannot) say the same thing about the various non-lawyers who received the subject documents. Chevron has not satisfied its burden as to its claims of attorney-client privilege over these documents.

While the Court does not find these documents subject to the attorney-client privilege, it does not order them produced on that basis alone, as each is also listed in Chevron's privilege log as subject to the work-product privilege. Accordingly, the Court

---

[4] As to documents **1, 4, 5, 16, 18, 26, 34, 63, 75, 80,** and **83**, the same information should be redacted by counsel for Chevron: an email contained in each document from Lloyd Escamilla to Doug McCormick that copies Joel Youngblood. No other information in those documents is to be redacted. As for document **140**, which begins with an email from Denise Boihem to Lloyd Escamilla, dated March 19, 2013, the second full paragraph in that email is to be redacted. The same information is to be redacted on document **141**, along with the second full paragraph in Mr. Escamilla's reply email to Ms. Boihem, dated March 19, 2013.

must determine whether they and scores of additional documents withheld as work product are to be afforded protection from disclosure under that privilege.

> B.     The Work-Product Privilege

Rule 26(b)(3) of the Federal Rules of Civil Procedure governs the disclosure of documents prepared in anticipation of litigation and provides:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>     (i) they are otherwise discoverable under Rule 26(b)(1); and
>     (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

> Fed. R. Civ. Proc. 26(b)(3).

As with the attorney-client privilege, the burden of showing that documents were prepared in anticipation of litigation, and therefore, constitute work product, falls on the party seeking to protect the documents from discovery. *St. James Stevedoring Co., Inc. v. Femco Machine Co.*, 173 F.R.D. 431, 432 (E.D. La. 1997).

The work-product doctrine shields from discovery the materials prepared by or for an attorney in preparation for litigation. *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385 (1947); *Blockbuster Entertainment Corp. v. McComb Video, Inc.*, 145 F.R.D. 402, 403 (M.D. La. 1992). It protects two categories of materials: ordinary work-product and opinion work product. *Snowden v. Connaught Lab., Inc.*, 137 F.R.D. 325, 330–32 (D. Kan. 1991); *Bross*, 2009 WL 854446 at *14-15; *see generally Upjohn*, 449 U.S. 383, 101 S.Ct. 677.

It has been widely cautioned, however, that the work-product doctrine "is not an umbrella that shades all materials prepared by a lawyer, or agent of the client." *El Paso,* 682 F.2d at 542; *see also Piatkowski v. Abdon Callais Offshore, L.L.C.*, No. 99-CV-3759, 2000 WL 1145825 at *2 (E.D. La. Aug. 11, 2000). It focuses only on materials assembled and brought into being in anticipation of litigation. *Piatkowski*, 2000 WL 1145825 at *2. Excluded from the work-product doctrine are materials assembled in the ordinary course of business. *El Paso*, 682 F.2d at 542. Work product protection also does not extend to the underlying facts relevant to the litigation. *See generally Upjohn*, 449 U.S. at 395–96, 101 S.Ct. at 685-86.

In determining whether a document was "brought into being" in anticipation of litigation, the primary focus is on the reason or purpose for creating the document. *Beal v. Treasure Chest Casino*, No. 98–CV-0786, 1999 WL 461970 at *3 (E.D. La. July 1, 1999). The Fifth Circuit has described the standard for determining whether a document has been prepared in anticipation of litigation as follows:

> It is admittedly difficult to reduce to a neat general formula the relationship between preparation of a document and possible litigation necessary to trigger the protection of the work product doctrine. We conclude that litigation need not necessarily be imminent, as some courts have suggested, as long as the *primary motivating purpose* behind the creation of the document was to aid in possible future litigation.
>
> *United States v. Davis*, 636 F.2d 1028, 1039 (5th Cir. Unit A), *cert. denied*, 454 U.S. 862, 102 S.Ct. 320 (1981)(citations omitted)(emphasis added); *accord In re Kaiser Alum. & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000), *cert. denied*, 532 U.S. 919, 121 S.Ct. 1354 (2001).

Factors that courts rely on to determine the primary motivation for the creation of a document include the retention of counsel and counsel's involvement in the generation of

the document and whether it was a routine practice to prepare that type of document versus whether the document was instead prepared in response to a particular circumstance. *See Piatkowski*, 2000 WL 1145825 at *2; *Electronic Data Systems Corp. v. Steingraber*, No. 02-CV-0225, 2003 WL 21653414 (E.D. Tex. July 9, 2003). However, the mere fact that a defendant anticipates litigation resulting from an incident does not automatically insulate investigative reports from discovery as work-product. *Carroll v. Praxair, Inc.*, No. 05-CV-0307, 2006 WL 1793656 (W.D. La. Jun 28, 2006), *see also Janicker v. George Washington Univ.*, 94 F.R.D. 648, 650 (D.D.C.1982) ("The fact that a defendant anticipates the contingency of litigation resulting from an accident or an event does not automatically qualify an 'in house' report as work product."). "If the document would have been created regardless of whether litigation was also expected to ensue, the document is deemed to be created in the ordinary course of business and not in anticipation of litigation" *Piatkowski*, 2000 WL 1145825 at *2.[5]

> The mere contingency that litigation may result is not determinative. If in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigative report is produceable in civil pre-trial discovery.

---

[5] In this vein, Wright and Miller provides:

> Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work-product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.
>
> Wright & Miller, Fed. Pract. & Proc. § 2024 (1994)(footnotes omitted).

> *Carroll,* 2006 WL 1793656 at *2 (citing *Binks Manufacturing Co. v. National Presto Industries, Inc.*, 709 F.2d 1109, 1119 (7th Cir. 1983)).

As one court has observed:

> Following any industrial accident, it can be expected that designated personnel will conduct investigations, not only out of a concern for future litigation, but also to prevent reoccurrences, to improve safety and efficiency in the facility, and to respond to regulatory obligations. Determining the driving force behind the preparation of each requested document is therefore required in resolving a work product immunity question.

> *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 984 (4th Cir. 1992).

The Court agrees that the instant case presents just such circumstances as described by the *National Union* Court and has therefore undertaken to determine the "driving force" behind the Chevron RCA investigation and related documents by reviewing each of the documents *in camera*.  For the reasons set forth below, the Court finds that Chevron has failed to establish that the "primary motivating factor" in the creation of the RCA and related documents was, in fact, to aid in possible future litigation and will order those documents to be produced.

Chevron relies almost entirely upon the declaration of Mr. Youngblood and the "Legal Charter" created by him in seeking to have these documents declared work product. Youngblood's declaration does establish that, "in the immediate aftermath" of the subject incident, Chevron, through Youngblood, anticipated the possibility of litigation and became involved in the investigation of the incident.

In response to this declaration and Chevron's argument that all of the materials related to the investigation are privileged, Settoon counters that testimony and other

evidence proves that it was Chevron's policy to perform an RCA after an incident, whether initiated by the HES function or by "Legal Charter," and that there is no evidence to differentiate between what would be a routinely conducted investigation and one conducted under a "Legal Charter."

Specifically, Settoon points to the testimony of Denise Boihem, a Chevron engineer who supervised the repair of the VP-01 pipeline, who agreed in her deposition that the "primary purpose of a root cause analysis" is to "prevent a similar accident from happening again in the future."  (Rec. doc. 253-1 at 10-11 (citing Exhibit 9, Deposition of Denise Boihem, p. 25:13-24)).  Additionally, Settoon stresses that Boihem testified that it is "part of the Chevron ordinary course of business to conduct a root cause analysis" after an incident:

> Q:  Okay. What about if there is a situation where third party contractors are not involved and a Chevron pipeline is struck by a random vessel and Chevron Pipe Line wants to figure out what happened? Isn't it part of the Chevron ordinary course of business to conduct a root cause analysis itself?
>               ...
>
> A:  It's our culture.
>
> Q.  Thank you.  And when you say it is part of the Chevron culture to conduct a root cause analysis, the purpose of that root cause analysis is to hopefully figure out what happened and prevent it from happening again in the future, correct?
>
> A:  Yes.
>
>                                    (Rec. doc. 253-4 at 32-33).

Settoon argues that this testimony is consistent with the clear language of Chevron's HES Safety Handbook, a copy of which was produced in the litigation by Chevron.  (Rec. doc. 253-4 at 61).  That handbook provides in part:

> • Promptly investigate and analyze the reported events with your team *to determine the root cause, and formulate*

14

*immediate corrective and preventive measures*. Depending on the nature of the incident, assistance from other departments may be warranted.

• *Data collection and investigation will begin within 24 hours*.

(*Id.*)(emphasis supplied).

Finally, Settoon directs the Court's attention to the statement of Randy Curry ("Curry"), identified by Chevron as the president of Chevron Pipeline, in a "Newsletter from Randy Curry to Fellow Employees":

> As many of you know, we have had a challenging start to the year. In March, a third-party tugboat operator struck one of our LPG pipelines near Lafitte, Louisiana, and we had a pipeline rupture which impacted Willard Bay State Park, Utah. Both of these incidents resulted in significant releases which will be impacting our scorecard. With challenges come opportunities. These incidents provide us the opportunity to review and continuously improve our processes. *We are conducting root cause analyses of both incidents and will apply lessons learned. Our ultimate goal remains the same – an incident and injury-free workplace.*

(Rec. doc. 253-4 at 2)(emphasis supplied).

Chevron responds to all this in brief by characterizing the deposition testimony of Boihem cited by Settoon as "imprecise" and the Safety Handbook language quoted as "general" to argue that the "broad, non-specific sources," cited by Settoon are "insufficient to overcome the express terms of the Legal Charter." (Rec. doc. 258 at 9). The Court disagrees.[6]

The Court has reviewed all of the Boihem deposition testimony submitted by the parties and does not find it to be imprecise. Boihem testified that she knows what a root cause analysis is (rec. doc. 253-4 at 22) and that root cause analyses are routinely

---

[6] The Court also notes that Chevron does not address Curry's statement at all in its Opposition Memorandum.

conducted after an incident as part of Chevron's "culture."  (*Id.* at 32-33).  That she was not

a member of *this* RCA team does not render her testimony imprecise or, for that matter,

irrelevant.

The RCA at issue in this case cannot be analyzed in a vacuum – to do so would be to

ignore the very object of this inquiry, which is aimed at divining whether a root cause

analysis would have been conducted in this case "regardless of whether litigation was also

expected to ensue."  *Piatkowski*, 2000 WL 1145825 at *2.  If this question is answered in the

affirmative, the RCA and associated documents will be "deemed to be created in the

ordinary course of business and not in anticipation of litigation."  (*Id.*).

The evidence and testimony before the Court establish that root cause analyses *are*

routinely conducted by Chevron after incidents such as these and that the purpose of such

analyses is to determine the root cause of said incidents in order to prevent similar

accidents from re-occurring.   Chevron does not dispute this, as even Youngblood

acknowledged in his declaration that such investigations are routinely undertaken "to

identify improvements to procedures or equipment."  (Rec. doc. 258-1 at 4).

The salient question is whether "legally chartered" root cause analyses are different

in kind than those "other" root cause analyses routinely conducted by Chevron.  Chevron

argues that they are, essentially because its in-house counsel says they are:   "Within

Chevron, legally chartered root cause investigations are not routine."  (*Id.*).  The problem

with this conclusory and self-serving statement is that it is undermined by the testimony

and evidence before the Court, including the documents themselves.

Notably, the *only* root cause analysis identified and provided to the Court is the

"legally chartered" RCA in dispute.  This is important because Chevron's position, as stated

by Youngblood, is that "HES incident reviews are *separate and distinct* from root cause analyses conducted at the request of the Law Department pursuant to a Legal Charter." (*Id.*).  This argument would be more convincing if there was actually another root cause analysis from which to distinguish the legally chartered one.  Where the testimony and evidence establishes that a root cause investigation is *routinely* conducted by Chevron after an accident and the root cause analysis at issue here is the *only* one that was conducted, it logically follows that the subject root cause analysis would have been conducted "regardless of whether litigation was also expected to ensue," and that it should therefore be "deemed to be created in the ordinary course of business and not in anticipation of litigation."  *Piatkowski*, 2000 WL 1145825 at *2.  Additional evidence, including the RCA and related documents themselves, support this conclusion.

This evidence begins with Curry's statement to fellow employees that Chevron was "conducting [a] root cause analysis of [the incident] and will apply lessons learned.  Our ultimate goal remains the same – an incident and injury-free workplace."  (Rec. doc. 253-4 at 2).  This statement is consistent with both the Boihem testimony and the HES Handbook guidance quoted above.  Moreover, it is entirely consistent with the RCA itself, which contains an extensive list of "Lessons Learned" as well as "Recommendations," all of which are clearly directed at the operations function of the company.  (PL doc. 51).

There are other indicators within the RCA itself that it was intended to serve the purposes described by Boihem and Curry:  The "Team Members" identified on the cover page of the RCA report include only the non-lawyer team members identified in the "Legal Charter"; the "Why Tree" information is set forth in a form that is clearly used for other incidents as well as the subject one; and the "Objectives" of the investigation, as stated in

the document, are "To discover what existed prior to [the] incident; [w]hat potentially contributed to [the] incident; and [w]hat measures, if any, were missing that could have prevented [the] incident." (*Id.*).  There is no mention of lawyers or litigation.

Finally, in an email setting forth the RCA Team's findings in great detail to President of Chevron Shipping, Michael Carthew, Team Leader Doug McCormick (a non-lawyer) advised Carthew (also a non-lawyer) that "there is a *parallel* investigation being conducted by our litigation team with aid of outside counsel in preparation of potential lawsuits."  (PL doc. 138).  The term "parallel" is not a term of art and its meaning is well understood: "extending in the same direction, everywhere equidistant, *and not meeting*."  Merriam-Webster's Collegiate Dictionary, 10th ed.  By definition, a thing cannot be parallel to itself. Certainly, if the RCA Investigation, led by Mr. McCormick, was supposed to be undertaken primarily to aid counsel in litigation, its own Team Leader was unaware of that fact.  While documents related to this "parallel investigation" conducted by the "litigation team" would arguably be protected under the work-product doctrine, the documents before the Court are not.[7]

The Court must look past the conclusory statements and arguments of counsel to determine the *actual* primary motivating factor behind creation of the RCA and related documents and whether these documents would have been created regardless of the possibility of litigation.  In this inquiry, the Court is guided, not only by its review of the

---

[7]  It is also worth noting again here that, while Youngblood may have taken pains to keep the investigation materials in the strictest of confidence, this email is evidence that others, including the Team Leader, did not. This particular document underscores the Court's earlier observation that in-house counsel cannot affirm, and this Court cannot know, what happened to this supposedly confidential, privileged information once it was shared among non-lawyers in this fashion.

aforementioned documents, but by the previous efforts of other courts faced with similar circumstances.  Two cases are particularly instructive in this regard.

First, in *Carroll, supra*, the court was called upon to determine whether a root cause analysis directed by an in-house law department was subject to the work-product privilege. *Carroll,* 2006 WL 1793656.  In support of its position that the work was protected, Praxair submitted an affidavit from its Safety and Environmental Services Manager that affirmed: (1) that he was appointed to an RCA team by in-house counsel within 24 hours of the subject accident; (2) that the team was formed in anticipation of litigation; and (3) that all work product of the team was to be marked and kept confidential, subject to both the attorney-client and work-product privileges.  *Id.* at *3.  These are all elements of the Youngblood declaration in this case.

In response to this proof, the plaintiff cited deposition testimony of Praxair employees indicating that "investigations are routinely done following any accident that occurs at Praxair."  *Id.*  Additionally, the plaintiff pointed to testimony establishing that, as a result of the recommendations contained in the RCA in that case, Praxair made a number of changes to its operations.  *Id.*  Similar evidence abounds in this record, including the testimony of Boihem concerning root cause analyses being conducted routinely as part of Chevrons "culture," references in the RCA itself to lessons learned and recommendations directed at operations functions, and Curry's statement that those lessons learned would be applied by the company.

The court in *Praxair* found that the defendant had "failed to establish that the primary motivating factor behind the investigation and the RCA was to aid in possible future litigation."  *Id.* at *4.  The court observed:

> Even if these documents were prepared with an eye towards litigation, it is evident that the RCA contains information which Praxair would be expected to compile in the ordinary course of its business after an accident has occurred in order to ascertain the cause of the accident, to evaluate equipment failures, and to implement changes in an effort to prevent similar accidents in the future.
>
> *Id.* (citing *Poseidon Oil Pipeline Co. v. Transocean Sedco Forex*, No. 00-CV-0760, 2001 WL 1360434 *4 (E.D. La. Oct. 30, 2001); *Occidental Chemical Corp. v. OHM Remediation Services Corp.*, 175 F.R.D. 431, 435 (W.D. N.Y. 1997)).

Based on the evidence in this matter, the same can be said of the Chevron RCA and related materials.

The Court also finds persuasive the analysis and reasoning in *In re Kidder Peabody Securities Litigation*, 168 F.R.D. 459 (S.D. N.Y. 1996). In that case, the securities firm, Kidder Peabody ("Kidder"), discovered that one of Kidder's major traders had misappropriated funds, causing it to overstate its earnings substantially. *Id.* In-house counsel for Kidder hired outside counsel within days of this discovery, with outside counsel immediately undertaking "an intensive fact-finding investigation to determine what had occurred and why." *Id.* at 463. In its effort to convince the court that the materials related to that investigation were protected from discovery by the work-product privilege, Kidder presented affidavits signed by its general counsel and outside counsel affirming that the investigation's purpose was to permit outside counsel to defend Kidder's legal interests in future legal proceedings and that outside counsel had indeed defended the firm in subsequent legal proceedings. *Id.* However, the court looked beyond those affidavits to the rest of the record, finding "[t]he balance of the record tells a somewhat different story" than counsel's affidavits. *Id.*

20

Based on that record, the *Kidder* Court found that Kidder had "failed to sustain its burden to demonstrate that the documents at issue were created principally or exclusively to assist in contemplated or ongoing litigation [and that] Kidder would have hired outside counsel to perform such an inquiry even if no litigation had been threatened at the time...." *Id.* The court was persuaded in part by statements made by the company in a press release announcing the retention of outside counsel, whose role would be "to lead a comprehensive investigation into what went wrong and to recommend steps to prevent a recurrence." *Id.* at 463. The Kidder statement calls to mind Curry's "Statement to Fellow Employees" wherein he advised that a root cause analysis was being conducted concerning the subject incident and that "lessons learned" would be applied. (Rec. doc. 253-4 at 2-3).

Also, germane to the current matter, the *Kidder* Court observed "Kidder's affiants offer no meaningful evidence. Instead, Kidder simply parrots the legal standard that the interviews were conducted principally as an aid to litigation." *Id.* at 463. The same can be said of the generic pronouncements about "anticipation of litigation" in Youngblood's declaration in this case.

Importantly, even though the *Kidder* Court believed that Kidder's investigation was conducted, *in part*, to prepare for anticipated litigation, that was not enough to shield the work as privileged. The court ultimately found that because Kidder also undertook its investigation, in part, "(1) to find out what [its trader] had done and why it had taken so long to discover the wrongdoing, and (2) to prepare a report summarizing his factual conclusions in detail and making recommendations for corrective action by Kidder," the disputed material was discoverable. *Id.* at 465.

As noted above, Chevron relies heavily on *Bross v. Chevron U.S.A., Incorporated*,[8] a case in which a different Chevron "legally chartered" RCA was found to be subject to the attorney-client and work-product privileges.  Accordingly, the Court has closely reviewed that decision, but cannot agree that it is dispositive of this matter as Chevron suggests.  The *Bross* decision was based in part upon that court's *in camera* review of the specific RCA in that case, which is obviously not the same document reviewed by this Court.  Additionally, there are other documents in *this* case, namely the Curry statement, HES Safety Handbook and several documents related to the RCA investigation itself, the likes of which the *Bross* Court apparently did not have before it in reaching its conclusion that the RCA in that case was privileged.

The record in this case demands a different conclusion.  It establishes that, while the subject RCA was conducted, in part, to aid in preparation for litigation, it was not primarily motivated by that concern.  While counsel may have sincerely desired to keep this work confidential, such a desire alone is insufficient to cloak the effort and related documentation in the work product privilege.  It is likewise clear to this Court from its review of all the evidence before it that the RCA and related documents would have come into being regardless of whether litigation was possible or anticipated, and that they are therefore not subject to the work-product privilege.

IV.   **CONCLUSION**

For the foregoing reasons, Settoon's Motion to Compel is GRANTED IN PART and DENIED IN PART.

---

[8] No. 06-CV-1523, 2009 WL 854446 at *4 (W.D. La. Mar. 25, 2009).

Documents **15, 19-25, 27, 28, and 57** are protected by the attorney-client privilege and will not be produced.  Documents **1, 4, 5, 16, 18, 26, 34, 63, 75, 80, 83, 140, and 141** contain both privileged and non-privileged information and shall be produced with the privileged information redacted as per the Court's instructions set forth above.

The remainder of the documents listed in the Chevron privilege log are not subject to any privilege and are to be produced.

New Orleans, Louisiana, this __31st__ day of ____December____, 2014.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE